**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK**

_____

**GREGORY THOMAS,**

           **Plaintiff,**

    **vs.**
                                          **5:08-CV-0318
                                                                        (NAM/DEP)**

**JAMES O'BRIEN SYRACUSE POLICE OFFICER,
OFFICER DADEY, OFFICER CUNNINGHAM,
SGT. RATHBUN,**

           **Defendants,**

_____

**APPEARANCES:**                                         **OF COUNSEL:**

Gregory Thomas
13366-052
USP Canaan
U.S. Penitentiary
P.O. Box 300
Waymart, PA 18472
*Pro Se*

Juanita Perez Williams, Esq.                     Mary Anne Doherty, Esq.
Corporation Counsel                              Assistant Corporation Counsel
300 City Hall
Syracuse, New York 13202
For Defendants

**Norman A. Mordue, Chief U.S. District Judge:**

**MEMORANDUM DECISION AND ORDER**

**I.  INTRODUCTION**

      This action stems from plaintiff *pro se* Gregory Thomas's arrest for loitering and criminal

possession of a controlled substance on April 14, 2005, in Syracuse, New York.  Plaintiff brings

this action pursuant to 42 U.S.C. § 1983 and alleges that defendant law enforcement officers

James O'Brien, Daniel Dadey, Richard Cunningham, and Thomas Rathbun subjected him to

unlawful search and seizure, false arrest, and excessive force, in violation of the Fourth Amendment of the United States Constitution. Plaintiff further claims that defendants' racial animus in initiating and executing his arrest deprived him of his right to equal protection, in violation of the Fourteenth Amendment. Defendants move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure[1] and seek dismissal of plaintiffs' claims of unlawful search and seizure, false arrest, and excessive force. Defendants have not sought dismissal of plaintiff's equal protection claim. Plaintiff opposes defendants' motion.

## II.  DEFENDANTS' EVIDENCE

### A.  Affidavits

#### 1.  Daniel Dadey, Police Officer, Syracuse Police Department

In his affidavit, Officer Dadey states:

On April 14, 2005, I was working with Sergeant Rathbun, Detective O'Brien and Detective Cunningham in the area of McKinley Avenue and Salina Street. We were driving an unmarked white sports utility vehicle. I was the driver of the vehicle. The corner of McKinley and Salina Street is known for its high drug activity and gun violence as well as an area governed by the Elk Block Gang.

While driving north on South Salina Street, I observed a black male personally know[n] to me as being Gregory Thomas, a known drug dealer, and a member of the Elk [B]lock Gang, standing on the corner conversing with an unknown female and two unknown black males.

As we pulled up to the corner to speak with Mr. Thomas, the other officers proceeded to get out of the vehicle. Mr. Thomas, upon seeing the officers, took off running.

Detective Cunningham, Detective O'Brien and Sergeant Rathbun got out of the vehicle and pursued Mr. Thomas on foot. I drove down on block and took a right onto Elk Street where I parked in the 100 block. I got out of the vehicle and came through the backyards off of the 100 block Elk Street, but by the time I arrived at the front porch on McKinley, Mr. Thomas was already apprehended and handcuffed.

---

[1] Defendants have provided plaintiff with a "Notification of the Consequences of Failing to Respond to a Summary Judgment Motion" as required by Local Rule 56.2.

> I did not assault Plaintiff with closed fists and elbows about his head and body. I never spoke with Mr. Thomas. Also I did not search Mr. Thomas or observe anyone searching him. I never put my hands on Mr. Thomas in any way and did not confiscate $25,000 from his person.
>
> I did not hear a police officer or detective use a racial slur towards Mr. Thomas.
>
> Mr. Thomas was not strip searched at the scene and no members of the unit performed a cavity search of Mr. Thomas.

Dadey Affidavit, ¶¶ 4-10 (paragraph numbers omitted).

### 2. **Richard Cunningham, Detective, Syracuse Police Department**

In his affidavit, Detective Cunningham states that:

> On April 14, 2005, I was working as part of the Emergency Response Team. There had been many shootings in the City of Syracuse and the Chief of Police thought that the members of the Emergency Response Team should patrol high crime/drug areas in order to keep gangs from congregating on street corners.
>
> On April 14, 2005, I was working with Detective O'Brien, Officer Dadey, and Sergeant Rathbun in the area of McKinley Avenue and Salina Street. We were driving an unmarked white sports utility vehicle.
>
> While driving on Salina Street, we observed a person leaning against a fence standing on the corner. Either Detective O'Brien or Officer Dadey recognized this person to be a known drug dealer, Gregory Thomas . . . .
>
> We pulled the vehicle over to speak with Mr. Thomas.
>
> As soon as Mr. Thomas saw the vehicle he took off running down the sidewalk. Sergeant Rathbun, Detective O'Brien and I got out of the vehicle and pursued Mr. Thomas on foot. I was not running directly behind Mr. Thomas but I was running parallel to him down the sidewalk. While he was running I observed Mr. Thomas throw his cell phone from his pants pockets. Mr. Thomas proceeded to cut over into the backyards of several homes on McKinley Avenue. As he was running I tried to tackle him and instead Mr. Thomas knocked me to the ground and continued to flee.
>
> Mr. Thomas headed up on the front porch of a home in the 100 block of McKinley. We later learned that Mr. Thomas lived in the home. Detective O'Brien and I attempted to take Mr. Thomas into custody and he resisted. We took Mr. Thomas to the ground on the front porch while he was attempting to go inside of the home.

3

> Plaintiff was not assaulted but forcibly taken into custody utilizing sufficient reasonable force necessary to take him into custody.
>
> Mr. Thomas was handcuffed. Mr. Thomas' cell phone was apprehended and turned . . . in to the police department.
>
> . . . I seized four hundred thirty five dollars from Mr. Thomas' pocket and subsequently turned it in as evidence. Mr. Thomas was searched incident to a lawful arrest but was not strip searched at the scene by any Defendant. At no time did a member of the Syracuse Police Department perform a cavity search of Mr. Thomas in relation to this incident. Likewise, at no time during this incident did a police officer or detective use a racial slur towards Mr. Thomas.
>
> Mr. Thomas was taken to a marked patrol car and transported to the Justice Center.

Cunningham Affidavit, ¶¶ 3-12 (paragraph numbers omitted).

### 3.    Thomas Rathbun, Sergeant, Syracuse Police Department

Sergeant Rathbun states in his affidavit that he was working with the other defendants on April 14, 2005, and:

> While driving on Salina Street, we observed a person leaning against a fence on the corner of McKinley Avenue and Salina Street. To the best of my knowledge either Detective O'Brien or Officer Dadey recognized this person to be a known drug dealer and gang member, Gregory Thomas . . . .
>
> As soon as Mr. Thomas saw the vehicle he took off running down the street. The vehicle was pulled over and Detective Cunningham, Detective O'Brien and I got out of the vehicle and pursued Mr. Thomas on foot. I recall Detective Cunningham taking a different route in pursuing Mr. Thomas. Mr. Thomas proceeded to run through the backyards of several homes on McKinley Avenue.
>
> Mr. Thomas ultimately ended up on the front porch of a home in the 100 block of McKinley Avenue. I learned that Mr. Thomas' family lived in the home. Detective O'Brien and Detective Cunningham apprehended Mr. Thomas on the front porch of a residence in the 100 block of McKinley Ave.
>
> I observed Mr. Thomas actively resist arrest as the officers were trying to take him into custody. Mr. Thomas was attempting to get inside the home on McKinley Avenue and did not want to be apprehended. As a result the officers had to physically take Mr. Thomas to the ground . . . .

4

Mr. Thomas was handcuffed and searched, taken to a patrol car and transported to the Justice Center.

Rathbun Affidavit, ¶¶ 5-10.  Sergeant Rathbun states that no law enforcement officer used a racial slur toward plaintiff, defendant was not strip searched, and no cavity search was performed.

### 4. James O'Brien, Detective, Syracuse Police Department

Detective O'Brien states that on April 14, 2005, he was working on the Emergency Response Team and was on patrol in the City of Syracuse with the other defendants:

> This detail included the 2300 block of Salina Street. I was aware that this area was known as a very high crime and drug area. The 2300 block of Salina Street was commonly known as an "open air drug market" meaning that drugs were bought and sold there twenty four hours a day. I knew this area to be frequented by "Elk Block" gang members. Further, I knew Gregory Thomas to be a main player in the "Elk Block" gang.
>
> On April 14, 2005 . . . we observed Mr. Thomas leaning up against a fence in front of a vacant house at . . . South Salina Street, speaking with an adult female and two juvenile males who appeared to be teenagers. I knew that the house . . . was the source of numerous civilian complaints regarding the sale of drugs.
>
> We pulled the vehicle over . . . . As soon as our vehicle came to a stop and I began to step from the vehicle, Mr. Thomas took off running . . . . Sergeant Rathbun, Detective Cunningham and I pursued Mr. Thomas through several backyards on McKinley Street. Mr. Thomas was ordered to stop but he kept running.
>
> Almost immediately, as Mr. Thomas began to flee, I observed him throwing items from his pockets. As Mr. Thomas turned the corner around the back of 123 McKinley, he jumped a metal fence and began to run southbound alongside that residence. It was at this point, I observed him discard another item along the eastside of 123 McKinley Ave. This item was small and appeared to be plastic. Mr. Thomas continued to run southbound as he came out from the side of the house, he collided with Detective Cunningham. Detective Cunningham attempted to stop Mr. Thomas, but Mr. Thomas flailed his arms knocking Detective Cunningham back. Mr. Thomas continued to flee across the street up onto the porch at 138 McKinley Avenue.
>
> Mr. Thomas tried to run into his home located at 138 McKinley. As he was attempting to get the door open, we caught up with him on the front porch and a struggle ensued.

5

> Mr. Thomas was told to put his hands behind his back to be handcuffed but he refused and proceeded to flail his arms. I recall that Mr. Thomas is a very large individual and very strong and therefore had to be forced to the ground. While he was on the ground he refused to surrender his arms by hiding them under his chest. Concerned that he may have been concealing a weapon, I struck him twice with a closed fist in his back and shoulder area. We were eventually able to force his hands behind his back and secured him in handcuffs.
>
> While we were in pursuit of Mr. Thomas, many other City of Syracuse police officers arrived on the scene and formed a perimeter around the area.
>
> After Mr. Thomas was taken into custody I went back and retraced our steps back to the eastside of 123 McKinley Avenue and recovered the section of plastic that contained a beige chunky substance that I observed Mr. Thomas throw out of his pockets during the pursuit. it was a torn piece of plastic that was not knotted and contained a chunk of what I believed to be cocaine. In my experience as a Syracuse Police Officer it is typical that drugs are packaged in small plastic baggies, which I have seen and confiscated over one hundred times . . . .
>
> The contents tested positive for cocaine. Mr. Thomas was charged with Criminal Possession of a Controlled Substance in the 3rd and 7th Degree and Loitering in the 1st Degree and transported to the Justice Center.

O'Brien Affidavit, ¶¶ 6-13, 18. Detective O'Brien states that he did not strip search plaintiff, perform a body cavity search of him, or have any other contact after he was handcuffed.

### B. Other Evidence

In addition to the affidavits, defendants submitted portions of Detective O'Brien's testimony regarding this incident taken during a federal trial in which plaintiff was charged with being involved in a racketeering conspiracy. Defendants also submitted their interrogatories and discovery requests as well as plaintiff's answer to their interrogatories.

In his answer to defendants' interrogatories,[2] plaintiff recounts the above event differently. According to plaintiff, the defendants approached plaintiff and Detective O'Brien told him "no

---

[2] Plaintiff states that he is answering the interrogatories in accordance with Federal Rules of Civil Procedure 26, 33, and 34. As such, the Court assumes that plaintiff's answers were provided "under oath". Rule 33(b)(3).

6

drug deals allowed on this street". Plaintiff states that the other officers "all began to laugh". Plaintiff asserts that he "was in the process" of "saying hello" into his cell phone, when Detective O'Brien "attempted to smack the cellular phone from plaintiff [sic] hands." Plaintiff states he "quickly placed" his cell phone behind him "to protect him from" Detective O'Brien, when Detective O'Brien grabbed plaintiff by his shirt collar" while the other officers "encircled" him and "began pat searching plaintiff's pockets and body". According to plaintiff, Detective O'Brien stated "you think you are a fucking big shot huh?  But . . . you are nothing, you fucking black trash drug dealer."

   Plaintiff states that on his porch he "was over taken and tackled at the front door" by Dadey, Cunningham, and Rathbun, who "all fell on top" of him and began "to pummel plaintiff about the head face and body with their close fist and their elbows". According to plaintiff, "each officer struck" him while he "looked out from the cover of my arms and hands, and the plaintiff could not breath[e]". Plaintiff states that Officer Dadey "shouted at plaintiff remove your arms from your head before we kill your black ass" and that Officer Cunningham "stated, you dumb black fucker". Plaintiff states that Officer Rathbun then instructed the other officers to get plaintiff's "black ass up and cuff him". Plaintiff asserts that after he was hand cuffed, Officer O'Brien removed plaintiff's shoes and took "thirteen thousand dollar bills" out of his right shoe and "twelve one thousand dollar bills" out of his left shoe. Next, plaintiff states, Officer O'Brien "put on a latex glove and then shoved his hand into plaintiff's pants and groped and painfully squeezed plaintiff['s] scrotum, while shouting in plaintiff['s] face, where is the dope? [O]'Brien then rammed his finger[]s between plaintiff's buttock[]s scratching plaintiff['s] anus roughly, as the other officer[]s looked on and laughed." Plaintiff states that no drugs or other contraband

7

were found on his person.

## III.   DISCUSSION

### A.   Summary Judgment Standard

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c).  Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law.  *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 258 (1986).  Irrelevant or unnecessary facts do not preclude summary judgment, even when they are in dispute.  *See id.*  The moving party bears the initial burden of establishing that there is no genuine issue of material fact to be decided.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  With respect to any issue on which the moving party does not bear the burden of proof, it may meet its burden on summary judgment by showing that there is an absence of evidence to support the nonmoving party's case.  *See id.* at 325.  Once the movant meets this initial burden, the nonmoving party must demonstrate that there is a genuine unresolved issue for trial.  *See* Fed. R. Civ. P. 56(e).  It is with these considerations in mind that the Court addresses defendants' motion for summary judgment.

### B.   Substantive Legal Standard

Plaintiff bases his federal claims on 42 U.S.C. § 1983, which reads in part:

> Every person who, under color of any statute, ordinance, regulation, custom or usage of any State ..., subjects or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action.

Section 1983 "is not itself a source of substantive rights," but merely provides "a method for

8

vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393-94 (1989).

### 1.     Seizure - **McKinley Avenue and Salina Street**

It is undisputed that plaintiff was standing on the corner of McKinley Avenue and Salina Street when defendants arrived and first began to exit their vehicle. Here, the parties' versions of the facts diverge. Defendants assert in their affidavits that plaintiff "took off running down the street" as soon as he saw defendants. According to plaintiff, defendants approached him, began to verbally harass him while he was on the phone, "attempted to smack the cellular phone" from plaintiff's hands, encircled him, pat searched his pockets and body, without reason, and called him a "black trash drug dealer." Plaintiff does not dispute that he ran from police.

Under *Terry*,[3] a police officer may briefly detain an individual for questioning if the officer has "a reasonable suspicion that the individual is, has been, or is about to be engaged in criminal activity." *United States v. Villegas*, 928 F.2d 512, 516 (2d Cir. 1991). A *Terry* stop is "an intermediate response allowing police to pursue a limited investigation when they lack the precise level of information necessary for probable cause to arrest." *United States v. Elmore*, 482 F.3d 172, 178 (2d Cir. 2007). Accordingly, the amount of suspicion needed to justify the encounter is less than a "fair probability" of wrongdoing, and "considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Sokolow*, 490 U.S. 1, 7 (1989).

A reasonable suspicion determination involves an assessment of the totality of the circumstances to see whether the officer had a "particularized and objective basis" to suspect criminal activity. *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quotation marks omitted).

---

[3] *Terry v. Ohio*, 392 U.S. 1 (1968)

9

The officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion." *Terry*, 392 U.S. at 21. While the officer may not rely on an "inchoate and unparticularized suspicion or 'hunch,' " *id*. at 27, he is entitled to "draw on [his] own experience and specialized training to make inferences from and deductions about the cumulative information available to [him] that might well elude an untrained person." *United States v. Muhammad*, 463 F.3d 115, 121 (2d Cir. 2006) (quoting *Arvizu*, 534 U.S. at 273 (alterations in original, internal quotation marks omitted)). "An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable particularized suspicion that the person is committing a crime." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). Therefore, courts evaluate the circumstances surrounding the stop "'through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training.' " *United States v. Bayless*, 201 F.3d 116, 133 (2d Cir. 2000) (quoting *United States v. Oates*, 560 F.2d 45, 61 (2d Cir. 1977)).

In this case, even assuming defendants had reason to approach and question plaintiff while he was standing on the corner of McKinley Avenue and Salina Street, crediting plaintiff's version of the facts, if defendants verbally harassed plaintiff, attempted to "smack" his cell phone from his hand, encircled him, and pat searched him without reason, a fact finder could conclude defendants exceeded the scope of a permissible *Terry* stop in violation of the Fourth Amendment. *Cf. United States v. Padilla*, 548 F.3d 179, 187 (2d Cir. 2008) ("[d]uring a lawful stop, if the investigating officer has reason to believe that the detained individual is armed and dangerous, he may conduct a patdown search for concealed weapons.") (citing *Terry*, 392 U.S. at 23-27).

### 2. **False Arrest  - Porch of 123 McKinley Avenue**

To prove false arrest under 42 U.S.C. § 1983, a plaintiff must prove that the defendant intentionally confined him without his consent and without justification. *See Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996). The existence of probable cause to arrest constitutes justification; "[t]here can be no federal civil rights claim for false arrest where the arresting officer had probable cause." *Singer v. Fulton Co. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995). Probable cause to arrest exists where "the arresting officer has knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Id*. at 119 (citation and internal quote omitted). The Second Circuit explains:

> While probable cause requires more than a mere suspicion of wrongdoing, its focus is on probabilities, not hard certainties. In assessing probabilities, a judicial officer must look to the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.... In sum, probable cause does not demand any showing that a good-faith belief be correct or more likely true than false. It requires only such facts as make wrongdoing or the discovery of evidence thereof probable.

*Walczyk v. Rio*, 496 F.3d 139, 156-57 (2d Cir. 2007) (citations and internal quotes omitted).

Plaintiff was charged with loitering in the first degree and criminal possession of a controlled substance in the third and seventh degree. New York Penal Law § 240.36 states that: "[a] person is guilty of loitering in the first degree when he loiters or remains in any place with one or more persons for the purpose of unlawfully using or possessing a controlled substance". Defendants assert that: their observation of plaintiff, "a known drug dealer", standing in front of a vacant house "known for drug" activity, with three other people; plaintiff's flight; and their observation of plaintiff discarding a "plastic" object that turned out to be cocaine, gave them probable cause to arrest plaintiff when they stopped him on the porch of 123 McKinley Avenue.

11

Indeed, plaintiff does not dispute that he was standing with others on the corner of McKinley Avenue and Salina Street when defendants approached or that he discarded a "plastic" object - cocaine - while he was running. Thus, even viewing the facts in the light most favorable to plaintiff and assuming that defendants' initial actions at the corner of McKinley and Salina were unreasonable, defendants had probable cause to arrest plaintiff. *See United Stats v. Baldwin*, 496 F.3d 215, 220 (2d Cir. 2007) (explaining that "Supreme Court precedent has 'implicitly authorized a defendant's seizure based on events occurring after issuance of an unreasonable order to stop.'") (quoting *United States v. Swindle*, 407 F.3d 562, 573 (2d Cir. 2005)). Accordingly, defendants are entitled to summary judgment on plaintiff's claim of false arrest.

### 3.     **Excessive Force**

Plaintiff claims that defendants violated his constitutional rights because they used excessive force in executing his arrest. The Supreme Court has defined the standard for review of excessive force cases as follows:

> In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force. *See* [*Baker,* 443 U.S.] at 140 ("The first inquiry in any § 1983 suit" is "to isolate the precise constitutional violation with which [the defendant] is charged"). In most instances, that will be either the Fourth Amendment's prohibition against unreasonable seizures of the person, or the Eighth Amendment's ban on cruel and unusual punishments, which are the two primary sources of constitutional protection against physically abusive governmental conduct. The validity of the claim must then be judged by reference to the specific constitutional standard which governs that right, rather than to some generalized "excessive force" standard. *See Tennessee v. Garner*, 471 U.S. 1, 7-22 (1985) (claim of excessive force to effect arrest analyzed under a Fourth Amendment standard); *Whitley v. Albers*, 475 U.S. 312, 318-326 (1986) (claim of excessive force to subdue convicted prisoner analyzed under an Eighth Amendment standard).

*Graham,* 490 U.S. at 393-94.  "Where, as here, the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens the right 'to be secure in their persons ... against unreasonable ... seizures' of the person. *Id.*  Thus, it is now well-settled that all claims that law enforcement officers have used excessive force in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard, rather than under a "substantive due process" approach. *Id.* (citing *Johnson v. Glick*, 481 F.2d 1028, 1032 (2d Cir.) *cert. denied* 414 U.S. 1033 (1973)).  "Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." *Id.*

It is apparent from only the most cursory review of the record that the Court cannot dismiss this claim presently.  Plaintiff claims that when defendants "tackled" him on the porch of 123 McKinley Avenue, they pummeled him with closed fists and elbows.  There are material factual issues that are disputed in connection with this claim including the nature of plaintiff's actions when defendants attempted to place him under arrest, what level of force was necessary to restrain him, which of the defendant police officers participated in the restraint and arrest of plaintiff and whether he was punched without justification.  These material questions are at the heart of whether defendants used excessive force in placing plaintiff under arrest and searching him.  Crediting plaintiff's allegations as set forth in his opposition to defendants' motion, a reasonable jury could find that plaintiff has met his burden of establishing a Fourth Amendment

13

violation. Thus, summary judgment is inappropriate on plaintiff's excessive force claim.

### 4. Search

Assuming defendants lawfully arrested plaintiff, the reasonableness of any search incident thereto still depends on the manner in which it was conducted. *Bell v. Wolfish*, 441 U.S. 520, 559 (1979). "A strip search is by its very nature a highly intrusive invasion," *Rivera v. United States*, 928 F.2d 592, 607 (2d Cir. 1991) (internal quotation marks omitted), and, as such, requires particular justification, *see Bell v. Wolfish*, 441 U.S. at 559 (describing totality-of-the-circumstances analysis for reasonableness of strip search, taking into account "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted"). "Whether a particular strip search is constitutional 'turns on an objective assessment of the . . . facts and circumstances confronting [the searching officer] at the time' of the search." *Hartline v. Gallo*, 546 F.3d 95, 100 (2d Cir. 2008) (quoting *Maryland v. Macon*, 472 U.S. 463, 470-71 (1985)).

Plaintiff states that after handcuffing him, Officer O'Brien "put on a latex glove and then shoved his hand into plaintiff's pants and groped and painfully squeezed plaintiff['s] scrotum . . . then rammed his finger[]s between plaintiff's buttock[]s scratching plaintiff['s] anus roughly". Defendants deny conducting any such search. Crediting plaintiff's version of the facts, however, there are material issues regarding the extent of the search during the arrest, whether a body cavity search was justified, and whether the circumstances warranted conducting such a search on the front porch of a residence.

### C. Qualified Immunity

Government officials performing discretionary functions enjoy a qualified immunity

14

shielding them from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated. *See Anderson v. Creighton*, 483 U.S. 635, 638 (1987). "It is well established that 'use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness.' " *Stephenson v. Doe*, 332 F.3d 68, 77 (2d Cir. 2003). "The objective element of this test requires the court to look beyond the generalized constitutional protection, such as the right to be free of unreasonable searches and seizures, and to determine whether the law is clearly established in a more particularized sense." *Kerman v. City of New York*, 261 F.3d 229, 236 (2d Cir. 2001). Thus, the relevant inquiry "is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id*. at 199 (internal quotation marks omitted).

### 1. Seizure

As discussed, the record in this case presents material factual disputes. According to defendants, there was no *Terry* stop because plaintiff ran from them before they could approach him on the corner of McKinley Avenue and Salina Street. According to plaintiff, the only reason defendants approached him in the first instance is because he is black. Further, plaintiff avers, defendants surrounded him, attempted to remove his cell phone from his hands, verbally harassed him, used racially charged language, and pat searched him for no reason. These factual disputes preclude a determination on whether qualified immunity applies in this case. Under plaintiff's version of the facts, it would be clear to a reasonable police officer in the same circumstances that it was impermissible to stop an individual solely because of their presence in a crime-ridden area, and further, that it would be unlawful to attempt to remove an individual's cell phone from his hands, verbally harass him, use racially charged language toward him, and pat

15

search him without any suggestion that plaintiff was secreting anything. Accordingly, summary judgment on the ground of qualified immunity is denied.

### 2. Excessive Force

An officer who has used excessive force is entitled to qualified immunity if his conduct falls in "the sometimes 'hazy border between excessive and acceptable force.' " *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (quoting *Saucier*, 533 U.S. at 206). Assuming plaintiff's version of the disputed facts and drawing all inferences in his favor, at the time of defendants' allegedly illegal conduct it was not reasonable for Dadey, Cunningham, and Rathbun to believe that once they were "on top" of him - it was lawful to "pummel plaintiff about the head face and body" with closed fists and elbows. Accordingly, summary judgment on the ground of qualified immunity is denied.

### 3. Search

Even assuming defendants had reason to believe plaintiff was secreting drugs on his person, without evidence that an unproductive routine search incident to arrest was conducted, or that there was an exigency that required such a search to be conducted in a public place, the Court concludes that defendants are not entitled to qualified immunity. It is well established that strip searches require particular justification. *See Bell*, 441 U.S. at 559; *Weber v. Dell*, 804 F.2d 796. In this case, crediting plaintiff's version of the facts, it would be objectively unreasonable for an officer to believe that, absent an exigency suggesting imminent destruction of evidence, a manual body cavity search of a handcuffed arrestee on the front porch of a house was lawful. Accordingly, summary judgment on the ground of qualified immunity is denied.

### IV. CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that defendants' motion for summary judgment (Dkt. No. 39) with respect to the claim of false arrest is granted; and it is further

**ORDERED** that defendants' motion for summary judgment is otherwise denied in its entirety; and it is further

**ORDERED** that this case is deemed trial ready as of September 30, 2010.

**IT IS SO ORDERED.**

Date:  August 9, 2010

_____
Norman A. Mordue
Chief United States District Court Judge